IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARANJIT BATTH, and GAGAN BATTH, <br><br> Plaintiffs, <br> v. <br><br> MARKET 52, INC., a California corporation, JERALD D. DOWNS, and LYNDSEY C. DOWNS, <br><br> Defendants. | 1:11-CV-1806  AWI SKO <br><br> ORDER ON PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION <br><br> (Doc. No. 6) |

Before the Court is Plaintiffs' application for a preliminary injunction against Defendant Market 52. On November 1, 2011, the Court granted Plaintiffs' *ex parte* motion for a temporary restraining order through the 7 U.S.C. § 499a, *et seq.*, the Perishable Agricultural Commodities Act ("PACA").  After receiving an opposition from Defendants and a reply from Plaintiffs, the Court held a hearing on November 15, 2011.  At the hearing, the Court granted Plaintiffs' application for a preliminary injunction, but the amount of the injunction was less than that requested by Plaintiffs.  This written order memorializes the Court's oral order of November 15.

**BACKGROUND**

In the summer of 2010, the parties agreed to buy and sell table grapes.  Two purchase orders from Market 52 were sent to Plaintiffs.  The two purchase orders contain identical language with one exception: one purchase order reads "net due payable September 23, 2011," and the other purchase order reads "net due payable October 2, 2011."  See Batth Dec. Ex's A &

1  B.  The purchase orders state that they are for fresh market quality table grapes, flame variety
2  grapes only, boxes are not to exceed 22 lbs net, the price paid shall be $2.75 per box, Market 52
3  shall be responsible for their own harvest labor, materials, freight and logistics when fruit is
4  ready to harvest, and the grapes are sold in 'as is' form and not subject to any dockage.  Id.  Both
5  purchase orders are dated 8/19/2011, but neither purchase order includes effective dates, i.e. they
6  do not expressly state durations or dates of validity.  See id.  Further, the purchase orders do not
7  indicate what quantities are to be supplied, which harvest dates apply to which purchase order, or
8  how much is to be paid on September 23 or October 2.  See id.

9  Jerald Downs, an officer of Market 52, declares that, "Market 52 contracted with
10 [Plaintiffs] to purchase market quality table grapes, and issued several purchase orders to
11 [Plaintiffs] on or around August 19, 2011."  Downs Dec. ¶ 2.  Downs declares that under the
12 purchase orders, "payment was to occur on either September 23, 2011 or October 2, 2011."  Id. at
13 ¶ 3.  Downs declares that "Market 52 harvested and took possession of the grapes on a rolling
14 basis."  Id. at ¶ 4.

15 Gagan Batth declares that, on "August 19, 2011, [Plaintiffs] entered into two contracts
16 with Market 52 under which [Plaintiffs] collectively sold . . . 77,795 boxes of . . . grapes at a
17 price of $2.75 per box . . . for a total sum of $213,936.25.  Payment under these agreements was
18 due on September 23, 2011, and on October 2, 2011."  Batth Dec. ¶ 4.  Market 52 paid $35,000
19 prior to the contractual payment due dates.  See id. at ¶ 6.  Batth declares that no payment was
20 received from Market 52 on either September 23 or October 2, and that inquiries about the
21 payments were made to Market 52.  See id.  Batth declares that Market 52 responded over the
22 course of five days with two e-mails.  See id. at ¶¶ 7, 8.  Market 52 represented to Plaintiffs that
23 it was courting new investors, it was experiencing a short term glitch, Plaintiffs would be taken
24 care of ASAP, it was attempting to shore up the company, and that it was tightening control
25 measures to bring up cash and get accounts like Plaintiffs' account moving and paid.  See id.

26 There is no dispute that Market 52 went to the Plaintiffs' farm and harvested the grapes.
27 See Batth Dec. ¶ 5.  That is, the grapes were sold on the vine, and Plaintiffs had nothing to do
28 with the harvesting, packing, and transport of the grapes.  See Batth Reply Dec. ¶ 3.  From

2

1  August 18, 2011 to September 15, 2011, Market 52 harvested and transported 77,795 boxes of
2  flame grapes from Plaintiffs.  See id. at ¶ 4.
3     On October 4, 2011, this Court issued a temporary restraining order under PACA against
4  Defendants in a different case.  See Courts Docket in William Consalo & Sons Farms, Inc. v.
5  Market 52, 1:11-CV-1660 AWI DLB at Doc. No. 13.  A stipulated order was signed by the
6  parties in *William Consalo & Sons*, which established a payment plan to those plaintiffs by
7  Market 52.  See id. at Doc. No. 16.
8     On November 1, 2011, this Court issued an *ex parte* temporary restraining order under
9  PACA against Defendants in this case.  See Court's Docket Doc. No. 11.  The order enjoined
10 Defendants from dissipating $178,936.25 in PACA trust assets.  See id.

## PLAINTIFFS' APPLICATION

*Defendants' Opposition*

Market 52 argues that, per regulation, if a seller contracts for a payment date that is more than 30 days after produce is received and accepted, then the seller does not receive PACA trust benefits.  Here, there is no PACA protection for grapes that were harvested between August 18 and August 24, since these dates are beyond 30 days from September 23.  This amounts to $51,746.75.  As for grapes harvested between August 25 and September 2, it is unclear whether payment for those shipments was due on September 23 (which would be less than 30 days from when Market 52 took possession) or October 2 (which is more than 30 days after which market took possession).  This comes to roughly $107,184 of grapes that is potentially outside the PACA trust framework.  Plaintiffs have failed to meet their burden of showing a likelihood of success, thus a preliminary injunction should not issue.  However, even if a preliminary injunction is granted, it should only be for approximately $20,000 (which is the amount owed to Plaintiffs less the approximately $52,000 that is clearly outside PACA protection, and less the approximately $107,000 that is potentially outside PACA protection).  Further, if a preliminary injunction is issued, Market 52 states that a bond should be imposed because of the ambiguous nature of the purchase orders.  Finally, Market 52 argues that imposing a preliminary injunction would prevent

it from following its obligations in the *William Consalo & Sons* case, which would lead to an inequitable result.

*Plaintiffs' Reply*

Plaintiffs argues that Market 52 focuses on when the grapes were "received," but ignores when the grapes were "accepted." The pertinent PACA regulation is in terms of "receipt and acceptance." PACA defines "receipt," but not "acceptance" at least in relation to this case. PACA does define "acceptance," but does so in terms that relate to consignments. This case is not a consignment case since Market 52 purchased the grapes outright. Instead, pursuant to the U.C.C. and California Commercial Code, "acceptance" includes a reasonable opportunity to inspect the goods, including a reasonable opportunity to inspect the whole of the goods supplied, so that a party may either accept part or the whole of the products, or reject part or the whole of the products. Thus, "acceptance" would have occurred on September 15, 2011, which is the date that Market 52 had all of the grapes. Taking September 15 as the earliest acceptance date, that date is within 30 days of both September 23 and October 2, which makes all the grapes eligible for PACA protection.

Additionally, Plaintiffs argue that even if the Court assumes that receipt and acceptance occurred during each shipment, only a fraction of the grape shipments would be outside the 30 day window. All grapes harvested from August 23 to September 15 would be eligible for PACA trust protection because they were received by Defendants within 30 days of either September 23 or October 2. The only potential shipments that may not be eligible would be those harvested from August 18 to August 23, which is a total of 6,242 boxes or $17,165.60.

With respect to a bond requirement, Plaintiffs argue that no bond should be required, as this issue was already addressed in the TRO ruling.

Finally, Plaintiffs argue that a PACA trust is unsegregated and inures to the benefit of all PACA trust beneficiaries. If there is a problem with payments agreed to in *William Consalo & Sons*, then each creditor will simply have to take a pro rata share from the PACA trust.

*Rule 65 Framework*

A plaintiff seeking a preliminary injunction must establish: (1) that he is likely to succeed

on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 129 S.Ct. 365, 374 (2008); Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust, 636 F.3d 1150, 1160 (9th Cir. 2011). "Injunctive relief . . . must be tailored to remedy the specific harm alleged." Park Vill., 636 F.3d at 1160.

*Relevant PACA Regulations*

"The maximum time for payment for a shipment to which a seller, supplier, or agent can agree, prior to the transaction, and still be eligible for benefits under the trust is 30 days after receipt and acceptance of the commodities as defined in § 46.2(dd) and paragraph (a)(1) of this section." 7 C.F.R. § 46.46(e)(2).

The term "receive" is defined as: "the time when the buyer, receiver, or agent gains ownership, control, or possession of the perishable agricultural commodities: Provided, That when perishable agricultural commodities have not been received as described above, and where there is a rejection without reasonable cause as provided in § 46.2(bb) and (cc), the goods will be considered to have been received when proffered."  7 C.F.R. § 46.46(a)(1).

The term "acceptance" is defined as: "(1) Any act by the consignee signifying acceptance of the shipment, including diversion or unloading; (2) Any act by the consignee which is inconsistent with the consignor's ownership, but if such act is wrongful against the consignor it is acceptance only if ratified by him; or (3) Failure of the consignee to give notice of rejection to the consignor within a reasonable time as defined in paragraph (cc) of this section: Provided, That acceptance shall not affect any claim for damages because of failure of the produce to meet the terms of the contract." 7 C.F.R. § 46.2(dd).

*Discussion*

As an initial matter, the Court is not convinced by Plaintiffs' argument that "receipt *and* acceptance" occurred on September 15.  First, the purchase orders do not identify any dates when grapes were to be delivered/supplied, nor do the purchase orders identify what quantity of grapes were to be supplied.  Without this information, it is unknown how the parties would know when the agreement had been fulfilled and all of the contracted grapes delivered.  Second, the

agreement states that the grapes were sold "as is."  If the grapes were sold "as is," it is unknown how the grapes could be rejected, i.e. not accepted, especially when it is Market 52 who is harvesting and transporting the grapes from Plaintiffs' farm.  Third, if Market 52 could reject the grapes on September 15, it would seem that a significant portion of the grapes that were harvested in mid-August[1] would have degraded to the point that they could no longer be marketed as table grapes.  This would allow for substantial rejection, and appears contrary to the nature of the transaction.  Fourth, Plaintiffs cite no cases that limit "acceptance" under § 46.46(e)(2) to purely consignment situations.[2]  It is true that the definition of "acceptance" that § 46.46(e)(2) incorporates is written in terms of a "consignee."  However, § 46.46 itself is not limited to consignments.[3]  Further, Black's law dictionary indicates that a "consignee" may refer to "one to whom a consignment is made," or "person named in a bill of lading to who or to whose order the bill promises delivery," or "one to whom goods are consigned, shipped, or otherwise transmitted."  Black's Law Dictionary p. 307 (Sixth Ed. 1990).  In the absence of citation to any contrary authority, because § 46.46 is not limited to consignments, the Court will not read the definition of "acceptance" under § 46.46(e)(2) as limited only to "traditional consignment contracts."  Cf. Horizon Mktg. v. Kingdom Int'l, Ltd., 244 F.Supp.2d 131, 141 (E.D. N.Y. 2003) (finding that an entity identified as a consignee on a bill of lading was the buyer of produce).[4]  Accordingly, the Court sees no basis for concluding that receipt and acceptance occurred, or was even intended to occur, on September 15, 2011.

The parties' respective declarations indicate that the grapes were harvested from Plaintiffs on almost a daily basis, and Downs describes that the grapes were harvested and received on a "rolling basis."  See Downs Dec. ¶ 4.  There is no evidence to indicate that the parties intended

---

[1] Again, the grapes were harvested from the vine by Market 52 between August 18 and September 15.  Also, Downs has declared that there is a significant portion of grapes that have now degraded.  See Downs Dec. ¶ 8.

[2] At oral argument, Plaintiffs' counsel conceded that he was unable to find any authority that limited the concept of "acceptance" under § 46.46(e)(2) to consignment transactions.

[3] The Court understands Plaintiffs to argue that "consignment" refers to the act of entrusting goods to another to sell for the consignor.  Cf. Plaintiffs' Reply at 2:1-2 with Black's Law Dictionary at 307 (6th ed. 1990).

[4] Horizon Mktg. is a case that involved an outright sale of produce by the grower.  See Horizon Mktg., 244 F.Supp.2d at 135-37.

6

anything other than for Market 52 to harvest and receive the grapes on a "rolling basis."  Since the purchase orders called for Market 52 to supply the labor and to harvest, pack, and transport the grapes over what apparently was a period of weeks, each day that Market 52 harvested grapes and transported the grapes to its facility is a day that Market 52 received and accepted a shipment of grapes.[5]  See 7 C.F.R. 46.2(dd); 7 C.F.R. § 46.46(a)(1).  Since each day appears to represent a new shipment of received and accepted grapes, the question becomes how to interpret the purchase orders that required payment on September 23 and October 2.

With respect to grapes harvested between August 18 and August 23, the parties do not dispute that such grapes are beyond 30 days of the September 23 payment date, and thus, are not entitled to PACA trust protection.[6]  See 7 C.F.R. § 46.46(e)(2).  The dispute centers on how to treat the remaining harvested grapes.

It is possible to read the purchase orders either as two separate contracts, or one contract that establishes two payment dates.[7]  The latter reading is the reading that makes the most sense to the Court.  The two purchase orders are identical except for the payment due dates, both purchase orders are dated August 19, 2011, and neither purchase order identifies quantities of grapes, specific dollar amounts due, or any dates of duration, termination, or application.  Further, the parties agree that it is through the purchase orders that the grapes were harvested, transported, and sold.  The Court sees no meaningful way to distinguish the purchase orders so that they may be viewed as two separate contracts.  Therefore, it appears to the Court that there is one agreement between the parties for the purchase of grapes, and that agreement includes two payment dates, but does not specify the amount to paid on those dates.  See Downs Dec. ¶¶ 2, 3.

Nevertheless, even if the Court were to consider the purchase orders to be two separate contracts, both readings of the purchase orders are problematic for Plaintiffs.  This is because

---

[5]The Court sees no way for Market 52 to have rejected any of the grapes because the grapes were sold "as is," and because it was Market 52 that actually selected and harvested the grapes.  Plaintiffs' counsel was unable to cite any authority that would have allowed Market 52 to reject any of the grapes that had been harvested, given the terms of the purchase orders.

[6]Plaintiffs make this concession as an alternative argument.  See Plaintiffs' Reply at 3:20-26.

[7]Plaintiffs contend that there are two contracts.  See Batth Dec. ¶ 4.

7

neither purchase order specifies quantities of grapes due, or specifies the amounts to be paid on the respective dates, or specifies which days' harvest corresponds to which purchase order.  Since there is nothing to distinguish the purchase orders other than the payment date, it appears to the Court that the parties envisioned that the final portion of any owed money would be paid on October 2. What that precise amount would be, however, is unknown.  Given that both purchase orders are dated 8/19/2011 and are missing key terms, it is possible to interpret the purchase orders as encompassing the possibility that 99.9% of the money owed for all grapes could be due on October 2.  If the September 23 purchase order had set either a specific dollar amount due, or specified how many boxes were to be supplied, or established for which harvest dates payment would be due, then the September 23 purchase order could be given effect, and application of the time limits of § 46.46(e)(2) would be straightforward.  However, because the September 23 purchase order is silent as to these critical terms, Plaintiffs cannot establish how much money was due on September 23 or how many boxes of grapes were supplied under the September 23 order.  Thus, Plaintiffs have not shown how many boxes of grapes fell within 30 days of September 23 as required by § 46.46(e)(2).  Without something to establish the amount of grapes that were produced pursuant to the September 23 purchase order, or something to distinguish the September 23 purchase order from the October 2 purchase order, Plaintiffs have failed to meet their burden of showing a likelihood of success on the merits with respect to the full $178,936.25.

Plaintiffs' essentially request that the Court ignore the October 2 purchase order and focus instead on the September 23 order.  The Court cannot do so because the October 2 purchase order potentially affects the 30 day limit of § 46.46(e)(2), and that limitation will be enforced.  See In re Altabon Foods, Inc., 998 F.2d 718 (9th Cir. 1993) (finding that grower could not receive PACA trust protection where contract provided "for payment periods of 45-60 days").  The October 2 purchase order was accepted by the parties, and Gagan Batth indicates that inquiries to Market 52 were made after the payment periods passed.  See Batth Dec. ¶¶ 6 -8.  In fact, given that Batth declared that Market 52 responded to the inquires on October 7 and October 12, see id., it appears to the Court more likely that Plaintiffs began making inquiries

after the October 2 deadline. Thus, the October 2 deadline meant something to both Plaintiffs and Defendants, and the Court cannot ignore it.

Based on the evidence currently before it, the Court can only conclude that all outstanding balances were due on October 2, but cannot determine any amount that was to be paid on September 23.[8] Further, since the agreement was performed on a "rolling basis," the parties appear to have envisioned that shipments of grapes would be harvested and transported on a daily basis over a period of several weeks. That is, there would be daily receipt and acceptance of grapes. With daily receipt and acceptance envisioned, and with a final due date apparently established, the Court believes that Plaintiffs have a likelihood of success of showing that grapes supplied 30 days prior to October 2 will receive PACA trust protection. From the receipt tags submitted by Plaintiffs, see Batth Reply Dec. Ex. A, the Court calculates that the grapes supplied by Plaintiffs from September 2 to September 15 amount to 28,333 boxes or, at $2.75 a box, a total of $77,915.75.

With respect to the balance of hardships, the public interest, and irreparable harm, the scale tips in favor of Plaintiffs. This is the second PACA TRO involved with Market 52, Market 52 has indicated that a significant amount of the grapes are now unmarketable,[9] and Market 52 made representations to Plaintiffs of cash flow problems. See Downs Dec. ¶ 8; Gagan Dec. ¶¶ 7-9. These considerations indicate diminishing assets and a likelihood of irreparable injury to Plaintiffs. See Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc., 222 F.3d 132, 140-41 (3rd Cir. 2000). Further, it is in the public interest to enforce the provision of PACA and the PACA trust. Cf. id.

With respect to the balance of hardships, and in particular the stipulated order in *William Consalo & Sons*, the Court believes that the balance of hardships tip in favor of Plaintiffs. First, Defendants submitted no evidence regarding their ability to pay the Plaintiffs as well as follow the stipulated order in *William Consalo & Sons*. Second, Market 52 owes an obligation to hold

---

[8] Similarly, the Court cannot determine which quantities of grapes were to be supplied pursuant to which purchase order.

[9] Downs declared that a significant amount of the Plaintiffs' grapes were held in storage, or rejected by buyers, and eventually degraded. See Downs Dec. ¶ 8.

9

PACA trust assets for the benefit of every PACA grower/creditor, including Plaintiffs in this case. Market 52 does not dispute that it owes Plaintiffs money for the grapes supplied. "Segregation of only part of the statutory trust solely to accommodate a beneficiary's singular interest is inappropriate because the statutory trust exists for the benefit of all unpaid produce suppliers." Frio Ice, S.A. v. Sunfruit, Inc., 918 F.2d 154, 159 (11th Cir. 1990). If Market 52 cannot meet its obligations under this order or under the stipulated order in *Williams Consalo & Sons*, then Market 52 should file further motions in this Court or conduct further negotiations with the appropriate parties.

## CONCLUSION

As described above, the Court finds that Plaintiffs are likely to suffer irreparable harm in the absence of an injunction, the balance of hardships tips in favor of Plaintiffs, it is in the public's interest to issue an injunction, and Plaintiffs have shown a likelihood of success as to $77,915.75 worth of grapes. The Court will grant Plaintiffs' application for a preliminary injunction.

Accordingly, IT IS HEREBY ORDERED that:
1. Plaintiffs' application for a preliminary injunction is GRANTED in part;
2. The $77,915.75 in PACA trust assets belonging to Plaintiffs and in the possession of the Defendants will serve as Plaintiffs' security for this preliminary injunction; and
3. Defendant Market 52, its officers, agents, factors, subsidiaries, assigns, and banking institutions (specifically including Defendants Jerald D. Downs and Lyndsey C. Downs) who receive actual notice of this Order are enjoined from dissipating, paying, transferring, assigning, or selling PACA trust assets up to a total of $77,915.75 until further order of this Court.

IT IS SO ORDERED.

Dated:  November 16, 2011

_____
CHIEF UNITED STATES DISTRICT JUDGE